UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RONITA MCCOLLEY,

                              Plaintiff,

        -against-                                          1:08-CV-01141 (LEK/DRH)

COUNTY OF RENSSELAER;
Investigator MICHAEL RILEY,
Individually and as an agent, servant
and/or employees of the County of
Rensselaer; CITY OF TROY; and Troy
Police Officers MOE DOE and JOE
DOE, whose true names are presently
unknown, Individually and as agents,
servants and/or employees of the City
of Troy,

                              Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.      INTRODUCTION

        Plaintiff commenced this action on October 23, 2008, bringing civil rights claims

pursuant to 42 U.S.C. § 1983 and alleging causes of action, *inter alia*, for false arrest, false

imprisonment, assault and battery, and trespass.  Dkt. No. 1 ("Complaint").  On February 10,

2010, Plaintiff filed an Amended Complaint, raising the same claims against Defendants County

of Rensselaer; Rensselaer Investigator Michael Riley ("Defendant Riley"); City of Troy; and

unknown Troy Police Officers Moe Doe and Joe Doe.  Dkt. No. 23 ("Amended Complaint").[1]

_____

        [1]  Plaintiff's initial Complaint also named Rensselaer County Sheriff Jack Mahar and
unknown Rensselaer County Sheriffs John Doe and Richard Roe as Defendants.  Compl. at 1.
Because Plaintiff raised no allegations against them in the Amended Complaint, all claims
against Jack Mahar, John Doe, and Richard Roe are dismissed.

Presently before the Court is a Motion to dismiss and for summary judgment filed by Defendants City of Troy and Troy Police Officers Moe Doe and Joe Doe (collectively, "Troy Police Defendants") (collectively with the City of Troy, "Troy Defendants").  Dkt. No. 32 ("Troy Motion").  Also before the Court is a Motion for summary judgment, submitted by the County of Rensselaer and Defendant Riley (collectively, "Rensselaer Defendants").  Dkt. No. 34 ("Rensselaer Motion").  Both Motions for summary judgment were filed on September 15, 2010. Troy Mot.; Rensselaer Mot.  On October 18, 2010, Plaintiff Ronita McColley ("Plaintiff") filed a Response to the Rensselaer Motion along with a Cross-Motion for summary judgment.  Dkt. No. 43.  On October 19, 2010, Plaintiff filed a Response to the Troy Motion along with a Cross-Motion for summary judgment and a Motion to amend the Complaint.  Dkt. No. 46.  On October 25, 2010, the Troy Defendants and the Rensselaer Defendants each filed a Reply.  Dkt. Nos. 53, 54.

For the reasons that follow, the Court: (1) grants the Troy Motion for summary judgment in its entirety; (2) grants in part and denies in part the Rensselaer Motion for summary judgment; (3) denies Plaintiff's Cross-Motions for summary judgment; and (4) denies Plaintiff's Motion to amend.

## II.     BACKGROUND

This action involves a search of Plaintiff's Troy apartment executed – pursuant to a warrant and via forced entry – at 6:00 a.m. on July 2, 2008.  Renssaelaer Defendants' statement of material facts (Dkt. No. 34-19) ("Rens. S.M.F.") ¶¶ 3, 41; Plaintiff's response to Renssaelaer Defendants' statement of material facts (Dkt. No. 43-1) ("Pl.'s S.M.F.") ¶¶ 3, 41.

### A.  Criminal investigation

2

Defendant Michael Riley is an Investigator with the Rensselaer County District Attorney's Office assigned to the Rensselaer County Drug and Gang Task Force ("Task Force"). Rens. S.M.F. ¶ 4; Pl.'s S.M.F. ¶ 4.[2] On or about June 23, 2008, Defendant Riley was contacted by a confidential informant ("CI") who had worked with the Task Force in the past. Rens. S.M.F. ¶¶ 11, 13; Pl.'s S.M.F. ¶¶ 11, 13. This CI had made four prior controlled buys for the Task Force and had previously provided information that resulted in two search warrants and in the seizure of illegal drugs and contraband. Rens. S.M.F. ¶¶ 14-15; Pl.'s S.M.F. ¶ 15. According to Defendant Riley, the CI stated that the CI could purchase crack cocaine from a specified individual in the city of Troy. Rens. S.M.F. ¶ 12.

Defendant Riley then met with the CI, along with members of the City of Troy Special Operations Section, to discuss how the CI could make this purchase. Rens. S.M.F. ¶ 16; Pl.'s S.M.F. ¶ 16. Defendant Riley arranged a controlled buy on June 23, 2005, in which the CI was provided with a transmitter and surveillance was put in place while the CI attempted to make a drug purchase. Rens. S.M.F. ¶¶ 17-20; Pl.'s S.M.F. ¶¶ 17-20. Upon making the purchase, the CI returned to an agreed upon location and gave Investigator Riley a small bag filled with a white powdery substance, which was determined to be crack cocaine. Rens. S.M.F. ¶¶ 20, 22-23; Pl.'s S.M.F. ¶¶ 20, 22-23.

The CI later contacted Defendant Riley and informed him that he had been taken to a

---

[2] Prior to working on the Task Force, Defendant Riley was employed as a deputy sheriff with the Rensselaer County Sheriff's Department for twenty-three years. Affidavit of Michael Riley sworn to September 15, 2010 (Dkt. No. 34-18) ("Sept. 2010 Riley Aff.") ¶ 2. During the course of Defendant Riley's employment with Rensselaer County, he has received "basic DEA training, narcotics investigation training, interview and interrogation training, use of force, training on securing and executing warrants, and training on the utilization of confidential informants." Rens. S.M.F. ¶ 5; Pl.'s S.M.F. ¶ 5.

"stash house" located at 396 1st Street, First Floor Front Apartment, Troy, New York.[3]  Rens. S.M.F. ¶¶ 24-25; Pl.'s S.M.F. ¶¶ 24-26.  According to Defendant Riley, the CI stated that upon arrival at 396 1st Street, the CI was shown approximately seven grams of powder cocaine, and the cocaine was cut with a King of Hearts playing card on top of an ironing board.  Affidavit of Michael Riley sworn to September 15, 2010 (Dkt. No. 34-18) ("Sept. 2010 Riley Aff.") ¶ 20.  In addition to Plaintiff's apartment at 396 1st Street, the CI told Defendant Riley about three additional locations in the City of Troy that were "maintained by two drug dealers known to the CI" and "involved in illegal drug activities."  Rens. S.M.F. ¶ 26; Pl.'s S.M.F. ¶ 26.  On June 25, 2008, Defendant Riley, along with members of the City of Troy Police Department's Special Operations Section, interviewed the CI in more detail about the drug activities the CI had identified.  Sept. 2010 Riley Aff. ¶ 22.  Also on June 25, 2008, Defendant Riley had the CI bring him to each of the four locations the CI had identified.  Rens. S.M.F. ¶ 28; Pl.'s S.M.F. ¶ 28.

Defendant Riley took the CI on "two separate drive-bys to confirm the location of each address provided by the CI as being involved in illegal drug activity."  Sept. 2010 Riley Aff. ¶ 25. Defendant Riley, along with his supervisor, conducted surveillance of each residence using undercover officers and unmarked vehicles between June 25, 2008 and July 3, 2008.  Id.  No narcotics activity was witnessed during this surveillance.  Affidavit of Michael Riley sworn to October 25, 2010 (Dkt. No. 54-8) ("Oct. 2010 Riley Aff.") ¶ 17.  At some point following the CI's identification of 396 1st Street, First Floor Front Apartment, Defendant Riley determined that Plaintiff Ronita McColley was the resident at that address, that she had no criminal history,

---

[3]  Although Defendant Riley now claims that the CI contacted him on June 25, 2008, Plaintiff notes that Defendant Riley previously stated that the CI contacted him on June 23, 2008, just an hour after the controlled buy.  Compare Rens. S.M.F. ¶ 24, with Pl.'s S.M.F. ¶ 24.

and that she had a young child.  Deposition of Michael S. Riley (Dkt. No. 36) ("Riley

Deposition") 42:4-45:7 (filed under seal).[4]

On June 25, 2008, the CI entered a voluntary statement describing the illegal drug activity

that he had witnessed and the locations at which it had occurred.  Dkt. No. 43-9 ("First Voluntary

Statement").  On July 1, 2008, the CI entered a second voluntary statement explaining that he had

initially failed to identify Seventeen 101st Street – one of the residences in question – because he

was not from the city of Troy and was therefore somewhat unfamiliar with the area.  Dkt. No. 43-

10 ("Second Voluntary Statement").

**B. Warrant application**

On June 27, 2008, Defendant Riley submitted an application for a search warrant for 396

1st Street, First Floor Front Apartment, in the City of Troy to Judge Turner with the City of Troy

Criminal Court.  Rens. S.M.F. ¶ 32; Pl.'s S.M.F. ¶ 32.  Defendant Riley identified as the basis for

the application information that the CI had provided about several residences involved in illegal

drug activities.  Rens. S.M.F. ¶ 33; Pl.'s S.M.F. ¶ 33.  In his search warrant application,

Defendant Riley stated the CI had "given information in the past that has proven to be both

accurate and reliable and which has led to five previous drug purchases and two search warrants,

which resulted in the seizure of illegal drugs and contraband."  Dkt. No. 32-5 at 1-5 ("Warrant

Application"); Rens. S.M.F. ¶ 35 (quoting Warrant Application); Pl.'s S.M.F. ¶ 35.[5]

---

[4]  Several of the documents that were filed and relied upon by both parties were filed
under seal to protect any sensitive or confidential information.  These documents are hereby
deemed unsealed only to the extent they are specifically cited or described in this opinion.  See
Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 296 (2d Cir. 2008).

[5]  The CI's fifth controlled buy occurred on June 24, 2008 and was the transaction that
gave rise to the search warrant application.  See Dkt. No. 46-7.

In the warrant application, Defendant Riley described the four residences and the two men – "Stink" and "Sport" – involved in the drug transactions.  Warrant Application at 2-3.  Defendant Riley identified 520 Second Avenue Apartment #5 as "Sport's" residence and stated that "Sport" dealt crack cocaine from the apartment.  Id. at 2.  Further, Defendant Riley stated that the CI had engaged in a "controlled police drug purchase" at this address.  Id.

Defendant Riley also stated that "[a]pproximately one hour after the CI made the controlled cocaine purchase from 'Sport', the CI advised [Defendant Riley] that 'Sport' brought the CI to 396 1st Street First Floor Front Apartment, City of Troy, Rensselaer County, New York State, to [show] the CI where 'Sport' gets his cocaine from."  Rens. S.M.F. ¶ 34 (quoting Warrant Application).  See Pl.'s S.M.F. ¶ 34.  Attached to the warrant application was a photograph of the building, which the CI had identified.  See Dkt. No. 34-18 at 22.  According to the application, the CI told Defendant Riley that the building's "exterior doors were yellow, the front of the building was made of unpainted brick and the apartment door was on the right side as you enter the front exterior doors."  Rens. S.M.F. ¶ 34 (quoting Warrant Application at 3); see Pl.'s S.M.F. ¶ 34.  Defendant Riley next recounted the CI's description of his interaction with "Stink" and "Sport" inside of 396 1st Street First Floor Front Apartment:

> The CI advised your deponent that upon entering the apartment, the CI observed, "Stink" scraping off approximately 7 grams of cocaine from a scale and place the cocaine in a baggie. The CI advised you (sic) Deponent that "Stink" used a "King of Hearts" playing card to scrape the cocaine into the baggie. The CI advised your Deponent that another black male, not known to the CI, was in the apartment and gave "Sport" a sandwich sized baggie filled with small black zip-loc baggies of crack cocaine. The CI advised your Deponent that the small black zip-lock baggies were the same style baggies that the CI purchased from "Sport".

Rens. S.M.F. ¶ 34 (quoting Warrant Application at 3); see Pl.'s S.M.F. ¶ 34.

Next, Defendant Riley identified two other residences for which searches were requested. Warrant Application at 3.  First, Defendant Riley stated that the CI told him that he had visited Building #5 Apartment 17 of Griswold Heights "twenty to thirty times over the past six months with 'Stink'" and that "Stink" had made drug deals on each visit.  Id.  According to the CI, Tanisha Bruce, "the registered adult tenant" who resided at this address with her mother, two young children, and sometimes her sister, sold "approximately one hundred grams of marijuana per week," which was provided to her by "Stink."  Id.  Defendant Riley also stated that the CI had told him that "'Stink' come[s] and goes as he pleases and occasionally stays at the apartment and also has custody and control over the drug activity from the apartment."  Id.  Second, Defendant Riley stated that the CI had identified Seventeen 101st Street First Floor Apartment as "Stink's" residence and had confirmed this address when the CI and Defendant Riley drove by together.  Id.  The CI stated that he had been to the apartment twice in the previous two weeks and that "Stink" had made crack cocaine sales from the apartment on both occasions.  Id.

Finally, Defendant Riley stated that those involved in drug trafficking often possess firearms and other weapons and that, for purposes of officer safety, it was critical that officers be able to execute the warrant at a time that would minimize the risk of violence.  Id.  Defendant Riley further requested that officers be allowed to execute the warrant without giving notice, so as to minimize the chance of violence or of drugs being hidden or destroyed.  Id. at 5.  On June 27, 2008, Judge Turner issued the requested no-knock warrant.  Dkt. No. 32-5 at 6 ("Search Warrant").

### C.  Warrant execution

The search warrant for Plaintiff's apartment at 396 1st Street, First Floor Apartment in

Troy was executed on July 3, 2008 at approximately 6:00 a.m.  Rens. S.M.F. ¶ 41; Pl.'s S.M.F. ¶

41.  The warrant was executed by Defendant Riley and Patrick Rosney of the City of Troy

Special Operations Section, as well as other officers and agents from the DEA, ATF, Troy Police

Department's K-9 unit, New York State Division of Parole, and the City of Troy Special Crimes

Unit.  Rens. S.M.F. ¶ 42; Pl.'s S.M.F. ¶ 42.  The officers made a forced entry, breaking through

the front door of Plaintiff's home and throwing a "flashbang grenade" through her window.

Rens. S.M.F. ¶ 46, 50; Transcript of McColley's 50-h Testimony (Dkt. No. 43-5) ("McColley 50-

h Testimony") at 5-7; Search Warrant.

        Before the officers entered her apartment, Plaintiff had been asleep in the living room

wearing only a T-shirt and underwear.  McColley 50-h Test. at 5.  Plaintiff was ordered to lie on

the floor of her bedroom, but there was not enough room.  Id. at 7-8.  Plaintiff was then told to

get on her bed, and the officers handcuffed Plaintiff behind her back.  Id. at 9-10; Rens. S.M.F. ¶

48.  Plaintiff asked numerous times if she could get dressed or cover up.  Affidavit of Ronita

McColley (Dkt. No. 43-4) ("McColley Affidavit") ¶ 9.  After the initial search of the apartment –

approximately one hour, by Plaintiff's estimate – Plaintiff's handcuffs were removed and

Plaintiff was allowed to put a skirt on.  McColley 50-h Test. at 11-12.  The total time for this

search is disputed by the parties.  Compare Rens. S.M.F. ¶ 49 ("[t]he search lasted approximately

an hour to an hour and [a] half"), with Pl.'s S.M.F. ¶ 49 ("[t]he search lasted almost three

hours").

        According to Plaintiff, at one point an officer asked her if the apartment was "398," and

she replied that her apartment number was "396."  McColley Aff. ¶ 15.  Plaintiff claims that

there seemed to be confusion among some of the officers as to whether they were in the right

apartment.  Id.  No drugs were found in the search of Plaintiff's apartment.  Rens. S.M.F. ¶ 55;
Sept. 2010 Riley Aff. ¶ 32. According to Plaintiff, the officers left her apartment with only two
pieces of paper: a National Grid bill and a paper from "Hudson Valley."  McColley Aff. ¶ 21.

Plaintiff was not physically injured during the search.  Rens. S.M.F. ¶ 52; Pl.'s S.M.F. ¶
52.  However, Plaintiff claims that she suffers from headaches and other emotional and
psychiatric pain as a result of this incident, and that she feels anxious, nervous and fearful in
everyday situations.  McColley Aff. ¶ 25.  Plaintiff also suffered personal property damage
during the search, including a broken windows and doors, a broken bookshelf, broken picture
frames, burn marks on her rug and wall, and broken dishes and knick-knacks.  McColley Aff. ¶
23.

## III.    STANDARD OF REVIEW

The Troy Defendants seek dismissal of Plaintiff's Complaint pursuant to Rule 12 of the
Federal Rules of Civil Procedure or for summary judgment pursuant to Federal Rule 56.  Rule
12(d) provides that if, on a motion pursuant to 12(b)(6), "matters outside the pleadings are
presented to and not excluded by the court, the motion must be treated as one for summary
judgment under Rule 56." FED. R. CIV. P. 12(d).  The Troy Defendants have annexed several
affidavits and exhibits to their Motion, which refer to matters beyond those addressed in
Plaintiff's Complaint and which the Court has considered.  Rule 12(d)'s requirement that "all
parties . . . be given a reasonable opportunity to present all the material that is pertinent to the
motion" is also satisfied here, as Plaintiff had adequate notice that the Troy Motion would be
converted to one for summary judgment, and in her response does not appear to contest that
conclusion. FED. R. CIV. P. 12(d); In re G. & A. Books, Inc., 770 F.2d 288, 295 (2d Cir. 1985);

Dkt. No. 46-4.  The Troy Motion is thus most appropriately treated as one seeking summary

judgment; the Rensselaer Motion also seeks summary judgment.

Rule 56 instructs a court to grant summary judgment if "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(c).  Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude

summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis

for the motion and of identifying those portions of the record that the moving party claims will

demonstrate the absence of a genuine issue of a material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986).  However, if the moving party has shown that there is no genuine dispute as to

any material fact, the burden shifts to the non-moving party to demonstrate "the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial."  Id.  This requires the non-moving party to do "more than simply show that there is some

metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Corp., 475

U.S. 574, 586 (1986).

At the same time, the Court must resolve all ambiguities and draw all reasonable

inferences in favor of the non-moving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530

U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d

Cir. 1998). The Court's duty in reviewing a motion for summary judgment is "carefully limited"

to finding genuine disputes of fact, "not to deciding them."  Gallo v. Prudential Residential

<u>Servs.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

**IV.    DISCUSSION**

**A. Rensselaer Defendants' Motion for Summary Judgment**

Rensselaer Defendants move for summary judgment on the basis that Plaintiff failed to

prove: (1) that there was a violation of her Fourth Amendment rights; (2) that Defendant County,

a municipality, is liable under § 1983 because it adopted an unconstitutional policy or custom;

(3) that the record supports Plaintiff's allegation of excessive force and assault and battery or due

process violations; (4) that Plaintiff's claims for Sixth, Eighth, Ninth, and Tenth Amendment

violations can be sustained; and (5) that her claims brought under 42 U.S.C. §§ 1982 and 1985

are supported by the record.  <u>See generally</u> Rensselaer Defendants' memorandum of law in

support of summary judgment (Dkt. No. 34-20) ("Rensselaer Memorandum") at 12, 17, 23, 25,

27.  In addition, Defendant Riley asserts the defense of qualified immunity.  <u>Id.</u> at 24.

To state a claim under 42 U.S.C. § 1983, a plaintiff must <u>establish a cause of action for</u>

<u>"the deprivation of any rights, privileges, or immunities secured by the Constitution or the laws"</u>

<u>of the United States.  German v. Fed. Home Loan Mortg. Corp., 885 F. Supp. 537, 573 (S.D.N.Y.</u>

<u>1995) (citing Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. §</u>

<u>1983)) (footnote omitted).  Plaintiff must therefore demonstrate that as a result of Defendants'</u>

<u>actions under the color of state law, Plaintiff suffered a denial of her federal statutory rights or</u>

<u>her constitutional rights or privileges.  See 42 U.S.C. § 1983; see also Annis v. County of</u>

<u>Westchester, 136 F.3d 239, 245 (2d Cir. 1998).  The traditional definition of acting under color</u>

<u>of state law mandates that the defendant in a § 1983 action have exercised power "possessed by</u>

virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  United States v. Classic, 313 U.S. 299, 326 (1941); see also Monsky v. Moraghan, 127 F.3d 243, 245 (2d Cir. 1997) ("defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State").  As employees of County of Rensselaer acting in their official capacity, Defendants were acting under color of state law.  Therefore, the question is whether Defendants' actions caused Plaintiff to be denied a federal statutory right or constitutional right or privilege.

### 1. Fourth Amendment Violations

#### i.  Legal Standard

Rensselaer Defendants have the burden to show that Plaintiff failed to prove a violation of her Fourth Amendment rights because she was "unable to raise a material issue of fact as to whether the search warrant for the First Floor Front Apartment of 396 1st Street . . . was based on probable cause."  Rens. Mem. at 13; see Anderson, 477 U.S. at 248.

The Fourth Amendment prohibits the unreasonable search and seizure of an individual, absent an emergency or a warrant supported by probable cause.  See Tucker v. County of Jefferson, 110 F. Supp. 2d 117, 120 (N.D.N.Y. 2000).  A plaintiff can demonstrate that his or her right not to be searched absent a warrant supported by probable cause "was violated where the officer submitting the probable cause affidavit 'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit' or omitted material information, and that such false or omitted information was 'necessary to the finding of probable cause.'" Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir. 1993) (quoting Golino v. City of New Haven,

950 F.2d 864, 870 (2d Cir. 1991)); Martinez v. City of Schenectady, 115 F.3d 111, 115 (2d Cir.

1997); Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991; see also Franks v. Delaware,

438 U.S. 154, 155-56 (1978).  Recklessness is inferred when the omitted information was

"clearly critical" to the discovery of probable cause.  Rivera, 928 F.2d at 604.

      The first step in assessing the materiality of an omission or error is to "correct" the

allegedly defective affidavit by inserting the information withheld from the issuing judge.

Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir. 1992).  The second step is for the court to

determine "whether as a matter of law [the corrected affidavit] did or did not support probable

cause."  Id. at 845.  If there is a finding of probable cause, there is no violation of a plaintiff's

Fourth Amendment rights.  Soares, 8 F.3d at 920; see also Singer v. Fulton Cnty. Sheriff, 63 F.3d

110, 118 (2d Cir. 1995).  If the corrected affidavit does not support a finding of probable cause,

then there is an issue of material fact, and summary judgment must be denied.  Cartier, 955 F.2d

at 845-46.

      Further, in reviewing an application for a warrant, "the materiality of a misrepresentation

or omission in an application for a search warrant is a mixed question of law and fact."

Southerland v. City of New York, 667 F.3d 87, 104 (2d Cir. 2012) (citing Velardi v. Walsh, 40

F.3d 569, 574 (2d Cir. 1994)).  "The legal component depends on whether the information is

relevant to the probable cause determination under controlling substantive law."  Velardi, 40

F.3d at 574.  "'[T]he weight that a neutral magistrate would likely have given such information,'

however, is a question for the factfinder."  Southerland, 667 F.3d at 104 (quoting Velardi, 40

F.3d at 574) (alteration in original).

There is no question that a reviewing court must give deference to an initial determination of probable cause.  See, e.g., Rivera, 928 F.2d at 604.  Courts have been warned "not [to] invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner."  United States v. Chimurenga, 609 F. Supp 1070, 1072 (2d Cir. 1985) (quoting United States v. Ventresca, 380 U.S. 102, 109 (1965)); United States v. Murtaugh, No. 5:08-CR-184, 2008 WL 4560096, at *1-2 (N.D.N.Y. Oct. 9, 2008).  Additionally, when determining what constitutes probable cause to support a search warrant when the warrant is based on information that is provided by a confidential informant, courts examine the information by analyzing the "totality of the circumstances."  United States v. Smith, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting Illinois v. Gates, 462 U.S. 213, 230-31 (1983)); see also Martinez, 115 F.3d at 115; United States v. Wagner, 989 F.2d 69, 72-73 (2d Cir. 1993).

That being said, an initial determination of probable cause is not unassailable.  See Messerschmidt v. Millender, 132 S.Ct. 1235, 1245 (2012).  In a case – such as the one at bar – in which allegations of error or omission in a warrant application are present, the decision that an issuing judge might have reached if provided with accurate information may well be an appropriate question for the factfinder.  See, e.g., Southerland, 667 F.3d at 104; Velardi, 40 F.3d at 574.  In other words, if the Court determines that the alleged inaccuracies or omissions in Defendant Riley's Affidavit are "relevant to the probable cause determination under controlling substantive law," Velardi, 40 F.3d at 574, then the city court judge's determination of probable cause when faced with a hypothetical, corrected affidavit is a question of fact.  See Southerland, 667 F.3d at 104.  The Court, therefore, must examine each of the defects in Defendant Riley's Affidavit that Plaintiff identifies to determine if the alleged flaw is relevant to the determination

14

of probable cause and raises a genuine issue of material fact as to the validity of the warrant.

ii. Alleged Errors and Omissions

In this case, Plaintiff contends that Defendant Riley committed such substantial errors and omissions in his warrant application that the Court should find probable cause lacking and therefore deem the warrant and subsequent police activity unlawful.  See generally Plaintiff's Memorandum of law in opposition to Rensselaer Motion (Dkt. No. 43-2) ("Pl.'s Rens. Opp. Mem.").  Plaintiff alleges that Defendant Riley's Affidavit in support of a warrant application suffered from the following defects: (a) that it failed to state accurately or that it made false statements and omissions of material fact regarding the date on which the confidential informant ("CI")  was allegedly brought to 396 1st Street and when Defendant Riley learned about that trip;[6] (b) that it contained false assertions that the CI accurately identified all three addresses; (c) that it ascribed more controlled buys to the CI than he had actually made; (d) that it did not include information that Plaintiff and her daughter lived on the first floor of 396 1st Street; and (f) that it did not reveal that surveillance of 396 1st Street had failed to indicate any criminal activity.  Id. at 6-10.  For the following reasons, the Court finds that Rensselaer Defendants have not met their burden, and questions of material fact remain as to whether the warrant was

_____

[6] Plaintiff casts doubt on Defendant Riley's affidavit with allegations that he made false statements regarding when the CI was brought to 396 1st Street and when Defendant Riley learned about the trip.  Pl.'s Rens. Opp. Mem. at 6.  Plaintiff's offer of proof is a detailed comparison of the search warrant application that was submitted to the city court judge on June 27, 2008 (id. at 6; Dkt. 43-8 at 6) and the CI's voluntary statement dated June 25, 2008.  Dkt. No. 43-9.  In the submitted search warrant application, Defendant Riley alleged that the CI told him that he had been to 396 1st Street on June 23.  Pl.'s Rens. Opp. Mem. at 7; Dkt. No. 43-8 at 7.  Plaintiff asserts that Defendant Riley knew this was untrue because the CI had provided him with a written statement on June 25 indicating that he had been to 396 1st Street on June 24. Pl.'s Rens. Opp. Mem. at 7; Dkt. No. 43-8 at 7.

15

supported by probable cause.[7]

### a. *Timing of Visit to 396 1st Street*

Plaintiff identifies inconsistencies relating to when the CI was brought to 396 1st Street and when Defendant Riley learned of the trip.  See Pl.'s Rens. Opp. Mem. at 6-10.  Plaintiff's offer of proof, however, rests on the kind of "hypertechnical" reading of the affidavit that is discouraged.  See Chimurenga, 609 F. Supp. at 1072.  While Plaintiff contends that, absent Defendant Riley's statement about the timing, there was no link between the suspects and the apartment, such an argument disregards the similarity between the method of cocaine packaging (the black zip-loc "baggies") that Defendant Riley cites in the search warrant application.  Pl.'s Rens. Opp. Mem. at 7; Warrant Application at 3.  That the CI may have been taken to 396 1st Street on June 23rd instead of June 25th, in and of itself, appears to be a minor error that has little bearing on the alleged drug transaction.  Id. at 7.  In other words, assuming for the moment that the CI had provided sufficiently detailed information about the apartment being investigated, an inaccuracy in the date of the CI's visit would probably have been immaterial to the city court judge's assessment.  See Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 465 (S.D.N.Y. 2008) (focusing on the "fair probability that contraband or evidence of a crime" was present in determining if there was probable cause).[8]  Taken in conjunction with the other issues raised by

---

[7]  Necessarily, because the Court finds that genuine issues of material fact exist, Plaintiff has also failed to meet her burden to succeed under her Motion for summary judgment.

[8]  Plaintiff briefly asserts that the timing of the CI's visit to 396 1st Street was essential to a finding of probable cause because of the issue of staleness.  Pl.'s Rens. Opp. Mem. at 11. An issuing judge is required to assess whether the information in the warrant application appears to be true at the time of the application, or whether it has become stale.  Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991).  The primary factors when determining staleness are the age

Plaintiff, this inconsistency may contribute to a general overstatement of the depth of the

investigation, but the failure to identify the date on its own was a minor error and is therefore

insufficient to raise a material issue that might defeat probable cause.  See United States v.

Smith, 9 F.3d 1007, 1014 (2d Cir. 1993) ("minor errors or inconsistencies [in supporting

affidavits do not] undermine the existence of probable cause").

### b. Identification of Seventeen 101st Street

Plaintiff argues that Defendant Riley made a false statement because his affidavit in

support of the warrant application fails to reflect that the CI did not "accurately and definitively"

identify the addresses of the three residences under "Stink's" "custody and control."  Pl.'s Rens.

Opp. Mem. at 8.  In the warrant application, Defendant Riley stated that the CI had informed him

that "'Stink' resides at Seventeen 101st Street 1st Floor Apartment, City of Troy, Rensselaer

County, New York State."  Warrant Application at 3.  However, in his voluntary statement,

signed on June 25, 2008, the CI had identified "Stink's" residence as an "Apartment on 6th [and]

Glenn Avenue."  First Voluntary Statement at 3.  After the CI entered the First Voluntary

Statement and before Defendant Riley filed the warrant application, the CI and Defendant Riley

drove to the three residences, at which point the CI identified Seventeen 101st Street as "Stink's"

actual place of residence.  See Second Voluntary Statement.  Ultimately, following the issuance

---

of the facts and the nature of the conduct alleged to have violated the law.  Id.  (quoting United
States v. Martino, 664 F.2d 860, 867 (2d Cir. 1981).  Courts have held that periods of weeks or
months between the last described act and the application for a search warrant was not enough
to make the information stale.  See Martino, 664 F.2d at 867 (22 days); United States v. Fama,
758 F.2d 834, 838 (2d Cir. 1985) (5 weeks); United Staets v. Rowell, 903 F.2d 899, 903 (2d Cir.
1990) (18 months) (quoting Rivera, 928 F.2d at 602).  In the present case, the city court judge
could have made a common sense interpretation that the interval was not sufficiently long to
make the information stale.  Dkt. No. 43-8 at 2, 7.

of the warrant but before its execution, the CI explained the inconsistency and stated that Seventeen 101st Street was "Stink's" address in a Second Voluntary Statement.  Second Voluntary Statement.

As Plaintiff emphasizes, Defendant Riley failed to note clearly that the CI had initially misstated "Stink's" address, but the warrant application does describe the CI's confirmation of the address.  Pl.'s Rens. Opp. Mem. at 8-9.  While the Court does weigh this slight inconsistency in considering the totality of the circumstances, Smith, 9 F.3d at 1012; United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000), this error on its own is not so egregious as to suggest reckless disregard or to lead the Court to conclude that there was clearly not probable cause.  When considered in light of other inconsistencies or weaknesses in the warrant application, this omission of a fact that weakens the CI's credibility may create a factual question as to the finding of probable cause.  However, there was no inconsistency as to Plaintiff's address, which is the one at issue here, and the CI did in fact identify his mistake and provide a plausible explanation (his lack of familiarity with the city of Troy).  Second Voluntary Statement.  Therefore, the Court cannot conclude that facts about an initial inconsistency in the CI's identification of a different address than the one in question were "clearly critical" to the evaluation as a matter of law. Rivera, 928 F.2d at 604; see also Smith, 9 F.3d at 1012.

### c.  Number of Controlled Buys

Plaintiff argues that Defendant Riley "knowingly and deliberately, or with reckless disregard for the truth, made a false statement in his search warrant about the number of controlled buys made by the CI."  Pl.'s Rens. Opp. Mem. at 9.  Defendant Riley stated in the

search warrant application that the CI had made five controlled buys.  Warrant application at 4.

In his September 15, 2010 affidavit, however, Defendant Riley indicates that the CI only made

"four (4) prior controlled buys."  Sept. 2010 Riley Aff. ¶ 14.  As the Rensselaer Defendants

accurately observe, the CI *had* made five controlled buys at the time of the 2008 Affidavit, but

only four of them for prior investigations – the fifth was for the June, 2008 transaction that led to

the warrant application.  Rensselaer Reply memorandum of law (Dkt. No. 54-10) ("Rens. Reply

Mem."); Dkt. No. 46-7.  While a reader could view the reference to five controlled buys in the

warrant application as implying five controlled buys *in prior investigations*, Plaintiff's allegation

that this perceived inconsistency amounts to an outright lie or a critical inconsistency must be

rejected as an inaccurate, "hypertechnical" reading.  Chimurenga, 609 F. Supp at 1072.

### d.  Plaintiff's Identity

Plaintiff argues that the warrant application was not valid because Defendant Riley failed

to provide information that Plaintiff and her daughter lived on the first floor of 396 1st Street.

Pl.'s Rens. Opp. Mem. at 9-10.  Unlike the factual flaws alleged in Plaintiff's prior arguments,

the omission of the identity of the apartment's residents in this case appears to be relevant to a

determination of probable cause.  Defendant Riley requested a no-knock warrant and asserted

that he had probable cause to gain access to Plaintiff's residence based on a description of the

premises as a venue for drug trafficking and a location for several violent men to store drugs and

weapons.  See Warrant Application. Yet Defendant Riley does not mention that: (1) he was

aware that Plaintiff resided at 396 1st Street First Floor Apartment; (2) he was aware that

19

Plaintiff had no criminal record;[9] and (3) he was aware that Plaintiff lived there with her daughter and no men.  See Riley Dep. at 42:4-45:7.

While identifying the occupants of a residence on a warrant application may not always be necessary to show probable cause, given that the CI did not mention a woman or a child in the apartment, omission of the fact that Defendant Riley knew that the only residents of the apartment at 396 1st Street were a woman and her daughter appears to be highly significant. Rensselaer Defendants argue that this omission is inconsequential and that it is predicated on "assumptions that a mother could not possibly be involved in drug trafficking."  Rens. Reply Mem. at 5.  But such an argument disregards the fact that there is no allegation that this particular mother was involved in drug trafficking.  On the contrary, Plaintiff's lack of criminal history and the CI's failure to mention a female occupant in his voluntary statements might indicate to an issuing judge that there was no clear link between Plaintiff and the alleged drug transaction.

While Rensselaer Defendants argue that the CI *did* indicate to Defendant Riley that a woman had been present at 396 1st Street,  id., this critical fact that might potentially have created a clear link between Plaintiff, her apartment, and the alleged drug transaction appears nowhere in the search warrant application or in either of the CI's statements.  See Warrant Application; First Voluntary Statement; Second Voluntary Statement.  Indeed, the CI's supposed statements about a female in the apartment do not appear anywhere directly in the record and were not referenced until Defendant Riley made mention of them in his deposition for this case.

---

[9]  Notably, at no point have any of the Defendants produced evidence to show or in any way suggested that they might have reason to believe that Plaintiff was involved in the drug trade.

Riley Dep. at 54.

It is also worth noting that Defendant Riley's warrant application lists the occupant of the other two residences for which a warrant is sought.  Warrant Application at 2-3.  The occupants of #5 Apartment 17 of Griswold Heights are women and children; however, the application specifies that Tanisha Bruce, the woman who resides there with her family, is allegedly actively involved in drug trafficking.  Id. at 3.  Therefore, by failing to include the fact that the resident of the 396 1st Street First Floor apartment was a woman with no apparent ties to the criminal activity in question, Defendant Riley was not omitting a minor detail that was irrelevant to a finding of probable cause; rather he was omitting facts that might draw into question the veracity of the CI's statement and challenge the link between Plaintiff's apartment and the criminal activity.[10]  Additionally, these omitted facts, if inserted, might weigh against the identification of "exigent circumstances" sufficient to grant a no-knock warrant and allow for the forced entry that ultimately gave rise to many of Plaintiff's claims.  See U.S. v. Brown, 52 F.3d 415, 421 (2d Cir. 1995) (quoting United States v. Gordils, 982 F.2d 64, 69 (2d Cir. 1992), cert. denied, 507 U.S. 1054 (1993) (identifying "a clear showing of probable cause . . . to believe that the suspect committed the crime" and "strong reason to believe that the suspect is in the premises being

_____

[10]  Rensselaer Defendants argue further that "CI identified 396 1st Street as a location under the control of 'Stink', not as 'Stink's' residence," making the identity of the apartment's resident a fact of little import to the probable cause determination.  Rens. Reply Mem. at 5. While a reasonable factfinder might conclude that a neutral issuing judge would still have found probable cause even knowing that the legal resident of the apartment was a woman with no criminal history, the Court is unconvinced that these facts would not be relevant to the determination.  Cf. U.S. v. Brown,52 F.3d 415, 418-22 (2d. Cir. 1995) (citing the fact that an individual had a criminal record as a factor considered in the warrant application).

entered" as factors weighing in favor of granting a no-knock warrant based on exigent circumstances).

### e. Surveillance of 396 1st Street

Plaintiff argues that Defendant Riley's failure to state in the warrant application that surveillance of 396 1st Street did not reveal criminal activity is also necessary to the finding of probable cause. Pl.'s Rens. Opp. Mem. at 10. Rensselaer Defendants counter that the CI's information indicated that 396 1st Street was a "stash house" and therefore that "officers did not expect to observe obvious narcotic activity." Rens. Reply Mem. at 5. While Defendants may not have been required to provide further corroboration of the CI's statements in order to establish probable cause, Lynch, 567 F. Supp. 2d at 466, in this case they did attempt to corroborate the statements about 396 1st Street. By conducting surveillance and then failing to report that he had, Defendant Riley was not failing to provide further unnecessary corroboration – as Rensselaer Defendants characterize his omission. Rens. Reply Mem. at 10. Rather, he was failing to provide known information that might have challenged the credibility of the CI's statement. That is, the CI's credibility is certainly relevant to the probable cause determination, cf. Lynch, 567 F. Supp. 2d at 466, and evidence that might draw into question the CI's credibility or fail to corroborate his statements are therefore certainly material to such a determination. Further, the "peaceful circumstances of the entry" of a residence to be searched are factors to be considered in determining if a no-knock warrant is appropriate, Brown, 52 F.3d at 421 (quoting Gordils, 982 F.2d at 69); information that surveillance had failed to uncover any criminal activity or even anything suspicious certainly appears relevant to such an inquiry.

22

Based on the foregoing, and considering the totality of the circumstances, the Court concludes as a matter of law that Defendant Riley's errors and omissions were relevant to the determination of probable cause.[11] See Velardi, 40 F.3d at 574. Because material questions of fact as to the weight that these omissions should be granted subsist, however, the Court also cannot find probable cause lacking as a matter of law. Id. Therefore, the Court cannot grant summary judgment for either Plaintiff or Rensselaer Defendants on the § 1983 claims arising from the alleged violations of Plaintiff's Fourth Amendment claims.

ii. Common Law False Arrest, False Imprisonment, and Trespass

Plaintiff also asserts common law tort claims for false arrest, false imprisonment, and trespass against the Rensselaer Defendants. Plaintiff argues that the Rensselaer Defendants lacked probable cause and that their entry into Plaintiff's residence and detainment of her therefore amounted to tortious conduct. Pl.'s Rens. Opp. Mem. at 10-11. On the other hand, Rensselaer Defendants contend that because the warrant was supported by probable cause, each

---

[11] Rensselaer Defendants have drawn the Court's attention to McKim v. Aaron, a companion case against the same defendants arising from the same warrant. Dkt. No. 62; No. 1:09-cv-650, 2011 WL 2580327 (N.D.N.Y. June 28, 2011). In McKim, the court dismissed the plaintiffs' claims and found that the warrant to search one of the other two residences (17 101st Street) was supported by sufficient probable cause. See id. While the Court recognizes the similarities between the two cases, substantial factual differences between the two sets of claims leads the Court to conclude that a different result is appropriate here.

Without discussing each distinguishing feature at length, one primary difference is worth emphasizing. Unlike the case at bar, McKim dealt with an address at which one of the suspected drug dealers lived, and the name of the suspect was provided in the search warrant application. Even though the warrant application in McKim also did not mention that surveillance had not yielded any sign of criminal activity, id. at *7, there is no question that there was a direct link alleged between the suspect, the residence, and criminal activity. The residence discussed in McKim was not only alleged to have served as a venue for criminal activity; it was also alleged to be the primary resident of a criminal suspect. Id. at *3.

23

of these claims is barred.  Rens. Mem. at 8-9.  Because the Court has concluded that it cannot rule on the presence of probable cause as a matter of law, due to the presence of genuine issues of material fact as to the impact of Defendant Riley's omissions on the city court judge's determination, the Court finds both of these arguments unavailing.  That is, because the determination of liability under any of these claims rests on a determination of the presence of probable cause, the Court must also refrain from granting either party's motion for summary judgment as to the state law tort claims.   Further, because the Court reaches no judgment on the presence of underlying tortious conduct committed by Defendant Riley, the Court also does not reach the question of whether Defendant County is liable for his conduct through *respondeat superior* liability.

### 2. Municipal Liability

Plaintiff argues that Defendant County of Rensselaer should be held liable under § 1983 for its failure to train Defendant Riley, a member of the Rensselaer County Drug and Gang Task Force ("Task Force"), in the proper procedures of securing a search warrant and working with a confidential informant.  Pl.'s Rens. Opp. Mem. at 13-15.[12]

"A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."  Connick v. Thompson, __ U.S. __, __, 131 S. Ct. 1350, 1359 (2011) (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 692 (1978)).

---

[12]  Plaintiff initially also asserted a claim for "failure to supervise," but she offered no argument in opposition to Rensselaer Defendant's Motion for summary judgment on this claim. Therefore, it will be addressed along with the other abandoned claims in Part I.A.5 *infra*.

However, local governments cannot be held liable under § 1983 under the theory of *respondeat superior*, Amnesty America v. Town of West Hartford, 361 F.3d 113, 125 (2d Cir. 2004), but rather are responsible only for "their *own* illegal acts." Pembaur v. Cincinatti, 475 U.S. 469, 479 (1986) (citing Monell, 436 U.S. at 665-683) (emphasis in original).

A failure to train employees adequately about their duty to avoid violating citizens' constitutional rights can be the basis for § 1983 liability in "limited circumstances." Canton v. Harris, 489 U.S. 378, 387 (1989). To be actionable, a municipality's failure to train its employees must amount to "deliberate indifference to the rights of persons with whom the [employees] come into contact." Id. at 388. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 409 (1997).

Although a "pattern of injuries [is] ordinarily necessary to establish municipal culpability and causation" in the failure to train context, Canton "did not foreclose the possibility" that a single incident could result in liability." Bryan County, 520 U.S. at 409. Such a single-incident violation can result in § 1983 liability only "in a narrow range of circumstances" where constitutional violations of the kind to which the plaintiff was subjected were the "highly predictable consequence" of the failure to train. Connick, 131 S. Ct. at 1361 (citing Canton, 489 U.S. at 390 n.10). Here, Plaintiff makes no allegation that there has been a pattern of constitutional violations due to Rensselaer's failure to train members of the Task Force and therefore "relies on the 'single-incident' liability that [the Supreme] Court hypothesized in Canton." Connick, 131 S. Ct. at 1350.

Defendant Riley was first employed by the Rensselaer County District Attorney's Office

in 2006 and is a member of the Rensselaer County Drug & Gang Task Force.  Sept. 2010 Riley

Aff. ¶ 2.  Before he began work with the District Attorney's office, Riley was employed as a

deputy sheriff with the Rensselaer County Sheriff's Department for twenty-three years.  Id. ¶ 3.

Plaintiff stresses the fact that Defendant Riley did not receive specific training in working

with confidential informants or in applying for search warrants after he joined the Task Force.

Pl.'s Rens. Opp. Mem. at 14.  However, Defendant Riley was not a novice officer and in fact was

appointed to the Task Force because of his experience in narcotics investigations.  Oct. 2010

Riley Aff. ¶ 3; cf. Connick, 131 S. Ct. at 1361 (narrow Canton single-incident exception could

apply if "police academy applicants" were not trained in "the constitutional constraints on the use

of deadly force").  Plaintiff had attended multiple formal training sessions over the years on a

variety of topics.  Sept. 2010 Riley Aff. ¶¶ 4-6, 9; Oct. 2010 Riley Aff. ¶¶ 4-5.  In particular,

Plaintiff attended the DEA Narcotics Investigation School while employed with Rensselaer

County.  Oct. 2010 Riley Aff. ¶ 4.  This training "covered the subject of search warrant

applications and investigations, the use of confidential informants, [and] how to establish

probable cause . . . ."  Id.

Based on the record, and in the absence of a pattern of constitutional violations to put

Rensselaer on notice, Plaintiff cannot show that the need for additional training for Defendant

Riley was so "obvious" such that Rensselaer's failure to institute additional training should be

deemed "deliberately indifferent" towards citizens' constitutional rights.  Even making all

inferences in Plaintiff's favor, the Court concludes that there is no material fact in dispute and

that the County of Renssaelaer is entitled to summary judgment on Plaintiff's § 1983 claims

pursuant to municipal liability.

26

### 3. Common Law Assault and Battery and Unreasonable Force under § 1983

Plaintiff also argues that officers' forcible entry into her residence and forcible

detainment of her constituted both common law torts and an unreasonable use of force under 42

U.S.C. § 1983.  Pl.'s Rens. Opp. Mem. at 10, 12-13.  Rensselaer Defendants move the Court to

dismiss these claims as a matter of law, and the Court must oblige.  Rens. Mem. at 15-17.  In the

§ 1983 context, "[w]hen determining whether police officers have employed excessive force in

the arrest context, the Supreme Court has instructed that courts should examine whether the use

of force is objectively unreasonable 'in light of the facts and circumstances confronting them,

without regard to [the officers'] underlying intent or motivation.'"  Jones v. Parmley, 465 F.3d

46, 61 (2d Cir. 2006) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).  "[N]ot every push

or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the

Fourth Amendment."  Graham, 490 U.S. at 397 (quoting Johnson v. Glick, 481 F.2d 1028, 1033

(2d Cir. 1973)).  Further, "'[a]ssault and battery claims under New York [law] are analogous to

excessive force claims under the Fourth Amendment,' and so courts evaluate such claims

'pursuant to the same standards.'"  Minasi v. City of Utica, N.Y., No. 6:10–cv–0975, 2011 WL

6842988, at *8 (N.D.N.Y. Dec. 29, 2011) (quoting Dukes v. Troy Hous. Auth., No. 1:08–cv–479,

2011 WL 1261317, at *7 (N.D.N.Y. Mar. 31, 2011).

Here, Plaintiff alleges that officers burst into her apartment, shoved her, handcuffed her,

and forced her to lie down for an extended period of time while they aimed guns at her.  Pl.'s

Rens. Opp. Mem. at 9-10.  While there may be factual questions as to the period of time that

Plaintiff was forced to lie down and whether she was shoved, even drawing all reasonable

inferences in favor of Plaintiff, Reeves, 530 U.S. at 150, these factual allegations are insufficient

27

as a matter of law to constitute unreasonable force.  Assuming that they occurred as Plaintiff

describes them, the shove and handcuffing do not reach the level of a constitutional violation or a

common law tort.  See Soichet v. Toracinta, 111 F.3d 124, at *2-3 (2d Cir. 1997) (upholding a

dismissal on summary judgment of Fourth Amendment claim and stating that officers' shoving

the plaintiff during a search for drugs was not excessive force as a matter of law); Smith v. City

of New York, No. 04 Civ. 3286, 2010 WL 3397683, at *10-11 (S.D.N.Y. Aug. 27, 2010)

(rejecting an excessive force claim based on the forcible cuffing of the plaintiff as a matter of

law); Rincon v. City of New York, No. 03 Civ. 8276, 2005 WL 646080, at *5 (S.D.N.Y. Mar.

21, 2005) (dismissing plaintiff's excessive force claim in which plaintiff was thrown to the

ground and handcuffed by officers with weapons drawn during a search for drugs as insufficient

as a matter of law).  As a result, regardless of the presence of probable cause, the Court find

Plaintiff's claims of excessive force and assault and battery insufficient as a matter of law.

### 4. Qualified Immunity

Finally, Defendant Riley asserts that he is entitled to the protections of qualified

immunity and is therefore entitled to summary judgment dismissing the Complaint.  Rens. Mem.

at 24.  The doctrine of qualified immunity protects government officials acting in their capacity

from liability for civil damages as long as their conduct does not "violate clearly-established

rights of which an objectively reasonable official would have known."  Thomas v. Roach, 165

F.3d 137, 142 (2d Cir. 1999); see also Martinez v. Simonetti, 202 F.3d 625, 633-34 (2d Cir.

2000).  Rensselaer Defendants have the burden to offer proof that it was objectively reasonable

for them to believe that their actions did not violate clearly established rights and that they are

entitled to qualified immunity.  See Young v. Selsky, 41 F.3d 47, 54 (2d Cir. 1994).  It is well-

28

settled that an individual has a clearly established right to not be arrested or prosecuted without probable cause. Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991), cert. denied, 112 S. Ct. 3032 (1992).

Even though the Court has concluded that there are genuine issues of material fact as to the validity of the search warrant and its basis in probable cause, however, such a determination does not in and of itself eliminate the shield of qualified immunity. See Messerschmidt, 132 S. Ct. at 1245. That is, officers may still be protected by qualified immunity if they violated an individual's constitutional rights, but "it was objectively reasonable [for them] to believe that their acts did not violate these clearly established rights." Amore v. Novarro, 624 F.3d 522, 530 (2d Cir. 2010) (quoting Cornejo v. Bell, 592 F.3d 121, 128 (2d Cir.2010)). "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or . . . in 'objective good faith.'" Messerschmidt, 132 S. Ct. at 1245 (quoting United States v. Leon, 468 U.S. 897, 922-923 (1984)).

However, "[w]here an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, the shield of qualified immunity is lost." Rivera, 928 F.2d at 604 (citing Malley v. Briggs, 475 U.S. 335, 344-45 (1986)); Golino, 950 F.2d at 870-71. In this case, while other officers might reasonably have relied on the warrant obtained by Defendant Riley, see Messerschmidt, 132 S. Ct. at 1245; Amore v. Novarro, 624 F.3d 522, 530 (2d Cir. 2010), Defendant Riley committed material omissions such that there is a genuine factual issue as to the presence of probable cause, so there is also a question as to whether he may enjoy the protection of qualified immunity. See Rivera, 928 F.2d at 604; Golino, 950 F.2d at

870-71.  That is, because a factual question remains as to the validity of the warrant due to

Defendant Riley's actions, a question also remains as to whether he is eligible for qualified

immunity.[13]  Therefore, the Court cannot decide as a matter of law that qualified immunity bars

Plaintiff's claims against Defendant Riley.

> *5. Claims Pursuant to 42 U.S.C. §§ 1982 and 1985, the 6th, 8th, 9th, and 10th Amendment and Claim for Failure to Supervise Pursuant to 42 U.S.C. § 1983*

While Plaintiff initially filed claims pursuant to 42 U.S.C. §§ 1982 and 1985, the 6th, 8th,

9th, and 10th Amendments, and a claim for failure to supervise pursuant to 42 U.S.C. § 1983, she

offered no argument in opposition to Rensselaer Defendant's Motion for summary judgment on

these claims.  "[T]he failure to oppose a portion of a motion for summary judgment is deemed

abandonment of the claim to which the motion applies, and, in the Northern District of New

York, is deemed consent to granting that portion of the motion."  Mitchell v. City of Albany, No.

08-CV-871, 2010 WL 1235389, at *7 (N.D.N.Y Mar. 31, 2010) (citing Rizzo-Puccio v. College

Auxiliary Services, Inc., 216 F.3d 1073 (2d Cir. 2000); N.D.N.Y.L.R. 7.1(b)(3)) (internal citation

omitted).  Further, the Court has examined these remaining issues and finds no merit to any of

these claims.  Therefore, the Court grants Rensselaer Defendants' Motion for summary judgment

as to these claims.

### B. Troy Defendants' Motion to Dismiss and for Summary Judgment

> *1. Troy Police Defendants*

---

[13]  The Court notes that it is not ruling that Defendant Riley recklessly or intentionally misled the city court judge as a matter of law.  Rather, the Court finds that a reasonable juror could conclude that Defendant Riley had acted recklessly or intentionally.

i. Qualified Immunity from Federal Claims

Troy Police Defendants Moe Doe and Joe Doe assert that they are entitled to the

protections of qualified immunity and are therefore entitled to summary judgment dismissing the

Complaint.  Troy Defendants' memorandum of law in support of summary judgment (Dkt. No.

32-1) ("Troy Mem.") at 3.  Like Rensselaer Defendants, Troy Defendants have the burden to

offer proof that it was objectively reasonable for them to believe that their actions did not violate

clearly established rights and that they are entitled to qualified immunity.  See Young, 41 F.3d at

54.  As discussed in Part IV.A.4, *supra*, it is well-settled that an individual has a clearly

established right to not be arrested or prosecuted without probable cause.  Golino, 950 F.2d at

870.

While the Court has concluded that there are genuine issues of material fact as to the

validity of the search warrant and its basis in probable cause, however, the Court may still find as

a matter of law that the shield of qualified immunity remains.  See Messerschmidt, 132 S.Ct. at

1245.  If "it was objectively reasonable [for Defendants] to believe that their acts did not violate

these clearly established rights," then qualified immunity bars Plaintiff's claims.  Amore, 624

F.3d at 530 (quoting Cornejo, 592 F.3d at 128).  Similarly, as stated in Part IV.A.4, *supra*,

"[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a

warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the

officers acted in an objectively reasonable manner or . . . in "'objective good faith.'"

Messerschmidt, 132 S. Ct. at 1245 (quoting United States v. Leon, 468 U.S. 897, 922–923

(1984)).  Therefore, for the Court to hold that the individual Troy Defendant Officers are not

entitled to qualified immunity, the Court must conclude that the search warrant was so flawed on its face that no reasonable officer would have believed it was supported by probable cause.  See Messerschmidt, 132 S. Ct. at 1250;  Groh v. Ramirez, 540 U.S. 551, 564 (2004).

Plaintiff contends that, because the Troy Police Defendants were present throughout Defendant Riley's investigation and warrant application process, they should have been aware of the defects in the warrant application and therefore should not be shielded by qualified immunity. Plaintiff's Memorandum of law in response to Troy motion for summary judgment (Dkt. No. 46-4) ("Pl.'s Troy Opp. Mem.") at 8-9.  Because Defendant Riley may be ineligible for qualified immunity due to material mistatements and omissions, see Rivera, 928 F.2d at 604 ("Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, the shield of qualified immunity is lost.") (citing Malley v. Briggs, 475 U.S. 335, 344–45 (1986)), Plaintiff argues, Troy Defendants should also be ineligible.

Plaintiff, however, cites no case law for the proposition that officers involved in an investigation lose the shield of qualified immunity based on material issues with an affidavit written and signed by another officer.[14]  The Second Circuit opinions addressing waiver of

---

[14]  In support of her argument, Plaintiff cites Leon for the proposition that "an officer can 'have no reasonable grounds for believing that the warrant was properly issued if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.'" Pl.'s Troy Opp. Mem. at 9.  Plaintiff, however, has misquoted the Leon Court, combining the conditional clause from one sentence with the consequence from another.  See 468 U.S. at 922-23.  The complete sentence from Leon that contains the conditional clause from Plaintiff's quotation is: "Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued."  Id. (footnotes and citations omitted).  The complete second sentence from Leon that contains the second clause in Plaintiff's conditional sentence is:

qualified immunity based on a warrant applicant's material errors or omissions speak only to the applicant or affiant.  See, e.g., Soares, 8 F.3d at 920; Golino, 950 F.2d at 870; Rivera, 928 F.2d at 604.  Defendant Riley stated in his deposition that the Troy City police officers had not "contributed any information to the warrant application," Riley Dep. at 79:1-14, and there is no evidence that any of the Troy Defendants read the affidavit prior to the warrant execution. Absent any authority to the contrary, the Court must conclude that Troy Defendants did not waive qualified immunity simply because Defendant Riley's warrant application contained material omissions that might have lead to a false finding of probable cause.

Therefore, the Troy Police Defendants lose the shield of qualified immunity only if the search warrant was so flawed on its face that no reasonable officer would have believed it was supported by probable cause.  In this case, the Court finds no such egregious facial flaws present. Cf. Leon, 468 U.S. at 923 ("a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.") (citing Massachusetts v. Sheppard, 468 U.S. 981, 988-991 (1984)).  The

---

"Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."  Id. (citing Franks v. Delaware, 438 U.S. 154 (1978)).  Plaintiff combines the two to conclude that if an affiant has deceived an issuing judge, no other officer could reasonably rely on the resulting warrant. Dkt. 46-4 at 9. Granted, the Court in Golino singled out these two quotations from Leon.  950 F.2d at 871. However, read in context, there "[a]n officer" refers to an affiant who has misled an issuing judge, not a third party officer who has subsequently relied on the defective warrant.  See id. Reading the rule otherwise would run counter to subsequent Supreme Court and Second Circuit precedent, which allows for an officer's good faith reliance to preserve qualified immunity even in the face of a constitutional violation.  See, e.g., Messerschmidt, 132 S. Ct. at 1245; Amore v. Novarro, 624 F.3d at 530.

search warrant identified "396 First Street 1st Floor Front Apartment" as the location to be searched and clearly identified items that might be used in illicit drug-related activity.  Search Warrant.  Because the Court finds that the warrant was not clearly deficient on its face and because Troy Defendants were not the affiants upon whom the city court judge relied in making his determination of probable cause, the Court finds that the individual Troy Defendants are shielded by qualified immunity and therefore grants their Motion for summary judgment on that basis.

### ii. Common law False Arrest and Trespass

The doctrine of qualified immunity generally only protects an officer from liability under federal causes of action.  Jenkins v. City of New York, 478 F.3d 76, 86 (2d Cir. 2007).  "However, New York common law fills this gap by providing government officials with a similar form of protection against state law claims."  Bancroft v. City of Mount Vernon, 672 F. Supp. 2d 391, 400-01 (S.D.N.Y. 2009) (citing Jenkins, 478 F.3d at 86; Jones v. Parmley, 465 F.3d 46, 63 (2d Cir. 2006)).  "The New York courts recognize the defense of qualified immunity to shield the government official from liability unless that action is taken in bad faith or without a reasonable basis."  Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 364 (2d Cir. 2004).  "Thus, as is true of federal law, an officer's entitlement to qualified immunity under New York law depends on the reasonableness of his actions," and "the only difference between the federal and state doctrines is that the reasonableness of an officer's action is judged with references to state law and the state, not the federal, constitution."  Bancroft, 672 F. Supp. 2d at 401 (citations and quotations omitted).  For the same reasons set out above, the Court holds that Troy Police Defendants Moe Doe and Joe Doe reasonably relied on the probable cause determination in the

34

search warrant, and are immune from claims for false arrest and trespass.

### iii. Common law Assault and Battery

All claims for common law assault and battery against Troy Police Defendants Joe Doe and Moe Doe are dismissed for the reasons set out in Part IV.A.3, *supra*.

### 2. City of Troy

Plaintiff seeks to hold the City of Troy responsible under the doctrine of *respondeat superior* for any torts committed by its employees acting within the scope of their employment. Pl.'s Troy Opp. Mem. at 17 (citing <u>Chimurenga v. City of New York</u>, 45 F. Supp. 2d 337, 344 (S.D.N.Y. 1999); <u>Jones v. City of Buffalo</u>, 267 A.D.2d 1101 (N.Y. App. Div. 1999)).  Because the Court has dismissed all of Plaintiff's claims against the individual Troy Police Defendants, all claims against the City of Troy must also be dismissed.

### C.  Plaintiff's Cross-Motion to Amend

Plaintiff seeks to amend the pleadings to name the specific City of Troy police officers that participated in the search and seizure of Plaintiff's home in place of the unnamed police officers Moe Doe and Joe Doe.  Dkt. No. 46-2 ¶¶ 13-18.  Notwithstanding that change to the caption, "Plaintiff's proposed amendments [would] not alter the [C]omplaint's factual allegations."  <u>Id.</u> ¶ 19.

Generally, leave to amend should be freely given.  Fed. R. Civ. P. 15(a); <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>Rusyniak v. Gensini</u>, 629 F. Supp. 2d 203, 212 (N.D.N.Y. 2009).  However, where the amendment is futile because it fails to state a claim or would otherwise be subject to dismissal, a court is justified in denying the amendment.  <u>Foman</u>, 371 U.S. at 182;

Evac, LLC v. Pataki, 89 F. Supp. 2d 250, 262 (N.D.N.Y. 2000).  As the Court has granted summary judgment in favor of Troy Police Defendants Moe Doe and Joe Doe on all claims, this amendment would be futile and is denied.

V.      **CONCLUSION**

Accordingly, it is hereby

**ORDERED**, that the Troy Defendants' Motion for summary judgment (Dkt. No. 32) is **GRANTED** in its entirety, and Defendants City of Troy, Moe Doe, and Joe Doe are hereby dismissed from this action; and it is further

**ORDERED**, that the Rensselaer Defendants' Motion for summary judgment (Dkt. No. 34) is **GRANTED in part and DENIED in part**, consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that Plaintiff's Cross-Motions for summary judgment (Dkt. Nos. 43, 46) and Motion to amend (Dkt. No. 46) are **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED**.

DATED:      May 04, 2012
            Albany, New York

Lawrence E. Kahn
U.S. District Judge

36